Our second case is number 19-10997, Trinet Group Inc. v. United States. Mr. Christensen. Jacob Christensen, Your Honors, for the United States. May it please the Court. This case presents an important question of whether employers who outsource their payroll processing functions in order to reduce the administrative burden associated with those tasks by doing so lose their status as the employer for tax purposes. The District Court's ruling that Gevity became the employer because it provided payroll processing services for its clients was wrong and should be reversed. The Court misinterpreted the statute, Section 3401D, in two basic ways. First, the Court adopted an erroneous co-employer theory under which it construed the statute to allow there to be more than one employer at any given point. Your position is that statutorily there can only be one employer? That is correct. Let me ask you a question about one of the arguments in your brief. You say that the notion of control in the statute, in 3401D-1, refers to exclusive control. And the only case that I was able to find that supports that proposition, and it does, are the Two-Ninth Circuit cases. Has any other court spoken to what control means in terms of exclusivity aside from the Ninth Circuit? I believe those are the only two cases, and those are the two cases that we've cited. That conclusion is supported by the language of the statute, which states that in order, well, in defining the term employer to be the person for whom an individual performs or performed any service as the employer of such person, except that if the person for the individual performs or perform the services does not have control of the payment of wages for such services, then the employer is a person having such control. And so the employer, the common law employer, in order for the exception to apply, the common law employer, it must be established that the common law employer, quote, does not have control of the payment of the wages. And so the Ninth Circuit in those two cases interpreted that to mean that the employer, the common law employer had to have no control over the payment of wages. And the legislative history that we've referred to supports that interpretation. There are only two examples given in the legislative history. And we submit to the court that the court is well within its rights to resort to the statutory language in this case. The statutory language is not so plain as to preclude looking to the legislative history for guidance. And in the legislative history, the example given of where the exception applies is the example of a pension fund, where pension payments are being made out of a fund to retired employees. In that situation, the former employer has absolutely no control over the payments that are being made out of the pension trust. So again, that example supports the Ninth Circuit's conclusion that the exception, which is intended to be construed narrowly as the court concluded and the Ninth Circuit court has concluded, the exception applies only when the common law employer has no control, as in the pension fund example. Isn't that example also in the regulation? Yes, it's also stated in the regulation. Now, contrast that example with the other example that's given in the legislative history with the branch office example. In that case, there's a corporate employer with branch offices and where, for administrative purposes, the corporate employer has assigned the task to a branch office to conduct the ministerial tasks of processing payroll and preparing the returns. The Congress in the legislative history stated that in that case, the corporate employer is still the employer that has the ultimate responsibility and legal duty for payroll taxes. That example encapsulates the basic principle here that an employer cannot delegate its responsibilities for employment taxes. But that's what my friend here is contending, that because the client companies in this case voluntarily assigned and entered into a contract for another party to prepare their payroll, that by doing so, the payroll processing company becomes the employer. That interpretation is seriously undermined by the legislative history and the branch office example that we've explained. That legislative history you referred to comes from a committee report, a reconciliation report, a Senate report, a House report? Yes, it's in the Senate report and also the House report. And there's an earlier House report, and I'm pretty sure it's contained in that first report, and we've cited all three. It's in the Senate report, and then it's in the later House conference report that we've cited in our brief. So it's in several reports, and they all refer to the same example. The other thing that that example illustrates is that the mere performance of the administrative tasks of processing payroll does not make a person the employer. In this case, you have the branch office that's actually doing the payroll processing and preparing the returns, but the legislative history is clear that it's still the corporate employer that is responsible for payroll taxes and that is the employer under the statute. I would clarify that in that example, the corporate employer and the branch office, just to clarify, are not the same entity. If they had been the exact same entity or the same taxpayer, then Congress wouldn't have had any need to include this example in the legislative history. So we're not talking about a corporate employer that's just delegating to an employee the tasks of performing these functions. Instead, we have a corporate employee and a separate entity as a branch office, perhaps a subsidiary, that's actually performing the payroll functions. We have the two entities, and Congress clarifies that it's the corporate employer that's still the employer. The district court, in this case, believes that the way that payments were generated, the way that money came from the client to listening to the company's generation, the backstop, the protocols, all of that led to a conclusion that Jevity was also a corporate employer. The court, we don't believe that the inner workings of the check processing and the account debiting controls who is the employer, because the overall economic arrangement between the parties was that the clients would supply the funds and that Jevity would forward those funds to the IRS. Part of the bargain, as I understand it, is that they're going to pay the payroll whether they got any money or not. That's a risk that they assumed in the bargain. Is that not so? I do not believe that, and we've stated this in our brief, that the record does not support that assertion. So Jevity has tried to argue— They had a bargain, as I understand it. Are you saying that the record doesn't support the proposition that part of the bargain was they would make the payroll regardless of whether the money was there? That's exactly what I'm saying, for two reasons. First— You think that's a fact issue? You move for summary judgment. Both sides were telling the court that there are no disputed facts, basically. That is a fact question, but we have a backup argument that even if they were, even if the agreement was that they would— The reason I ask that is that time is money. So as part of the bargain, as the entity making the payment doesn't have the funds sent to it, it's basically borrowing the money. There's an interest rate. It's losing the money. I'll put it that way. Well, depending on the type of the payment we're talking about, a day or two before— There's different kinds of payments. Right, right. And let me point out that even— Again, you're— What you were trying to say is the record is sort of mixed, as I understand it, with regard to just Choflat's question. Some of the agreements indicated that the company bore the risk of paying payroll and taxes even if the client didn't forward the funds, but not all of the agreements had that language in them. That's correct, and even— It's a mixed bag. I understand that. And even the agreements— There were three ways of making the payments. Right. I understand it in the record. And the agreements that did have that language were inconsistent because they also gave Gevity the right to terminate any client company or remove from their payroll any employee for whom they learned payment would not be forthcoming in a timely manner. Sure, but only after they made that one payroll payment, because they were contractually obligated to do so. They could terminate after that to make that payment. No, no, I don't think that is established, Your Honor. The clients were required to inform Gevity if they were going to be— Under the contract, if they were not going to be able to make payroll, they had to inform Gevity of that fact. And at that point, Gevity had the ability to terminate the employees for whom payment would not be made. Again, even— I thought the client retained ultimate decision about hiring and firing. That's correct. I mean, Gevity wouldn't have to make the payroll and pay wages to that client once they learned that payment would not be forthcoming. And the client was contractually obligated to let Gevity know that before there was a default, that it didn't have sufficient funds. If ultimate liability to pay was not dependent on the client supplying the funds, why shouldn't this baby be split so that with regard to those agreements in which Gevity retained ultimate responsibility to pay, even if the client didn't supply the funds, they may be the statutory employer there, but not in the other? So the reason— So in the vast majority of cases, the client's paid. The mere possibility, looking forward, that a client may default does not establish control. In the very few cases where a client actually did default, you know, at most, the court could find that Gevity may have controlled the payment in those few cases. And I'll just give stats. For example, in the year 2006, Gevity reported total gross receipts of $6.1 billion on its tax return. And that's at document 30-27. And the bad debts that Gevity ended up writing off in 2006 was $1 million. And that's at document 29-11 at pages 1 and 2. So $6.1 billion gross receipts, only $1 million was written off in bad debts. We think that's significant. I see my time's up, so— You've saved your time for rebuttal. Thank you very much. Mr. Killian. Good morning, your honors. May it please the court. Before I address some of the points Mr. Christensen made today, I'd like to do a little bit of table setting, just to put this case in context. The Supreme Court and every court of appeals that has applied 3401D agree that if you actually pay employees out of your own bank account, that you have control of the payment of wages in our statutory employer. That cannot be right. Could you speak up? Certainly, your honor. Well— That cannot be right. If you're a mere conduit— Sure, but I agree, your honor— You're the statutory employer. I think the question in those cases, though, and maybe this will be a disagreement in our terminology on what is a conduit, is whose bank account is being used. So, for instance, Bank of America would absolutely be a conduit, because it's not Bank of America's own personal bank account. I hire somebody as an independent contractor for my company. Sure. Okay, and I'm having trouble with my banks, so at that point, I don't have a bank account. Sure, well— I go to you— I agree, cash— And I say, I am going to give you cash. Please pay this person as my independent contractor. You're the employer? Cash would be a very different situation— Are you the employer? Who am I in your hypothetical? Yes, are you the employer? I'm trying to understand your honor's hypothetical. The money was paid out of your account. Out of my own bank account? Absolutely. You're the employer. Yes. If I put money into my— You're just a conduit. In that scenario, you have no control over anything else. You're telling me that— No, but I do have control over the payment of the wages, and that's the material type of control. The only control, in fact, that Congress made mandatory under 3401D. I think the case, your honor, is— the closest example to your honor's hypothetical is the Ninth Circuit Southwest restaurant case, where there were four restaurants. One restaurant just took checks from the other ones and then paid the employees of all four restaurants. And that one restaurant, even though it did not control any of the other employees, and in fact was just another restaurant, was deemed by the Ninth Circuit to be the statutory employer for all four—the employees of all four restaurants. So what matters is not timing, not risk, but just whether it comes from your bank account. That's all that matters. We believe that's the most important factor. The other one's cut our way in this situation, but the clear rule, the administrable rule, is the bank account rule itself. And I direct the court back to the— That's really all-inclusive. It doesn't—nothing else matters, if you're right. Correct. Because if you had the clients in this case advancing money a month ahead of time, more than they needed to pay— Correct. —to just have Gevity then, with the new records, pay out— Sure. —had no risk of default, no risk of payment out of your own funds, your argument would still be that Gevity is the statutory employer. Absolutely. And the reason for that, Your Honor, is that we have to look at this definition of employer in connection with the withholding obligation. These two are inextricably linked, as the Supreme Court said in the Ott case. You have to look at the definition in connection with the obligation to withhold. What withholding is, is taking a slice out of an employee's wages. So if I could give Your Honor a hypothetical, right? If an employee earns $100 one week and the government's share of that as taxes is going to be $15, let's say. If the employee is paid all $100, then someone violated the withholding obligation. And so who is the person who made that mistake? Who paid the employee $100 when the employee was only supposed to get $85 and the government was supposed to get $15? The answer is the person who has control of that payment. Not the person who set the wages maybe three months ago. Not the person who tells the employee to show up to work, how many hours to work in a particular week. It's the person who makes the payment. Now, to your point about cash, Judge Jordan, I do think a cash-only business would be subject to different rules because the question of control of a payment in a cash-only enterprise is different. But in the modern economy, where the vast majority of payments are done through a bank account, when the payment is actually made out of a bank account, we look at who was the owner of that bank account. And so as the Fourth Circuit said in the Winstead case, you look at whether the bank account, who owns the bank account, when a bank... Let me start over. As the Fourth Circuit said in the Winstead case, when a bank account is used for paying wages, you look at the owner of that account and then that's the person who's the employer. So Judge Jordan, to answer one of the questions you asked my colleague at the very outset here, the Winstead case from the Fourth Circuit speaks about exclusivity as well. It's not just the Ninth Circuit cases in Southwest and Century. Judge Wilkinson wrote... The Fourth Circuit has a different take, right, on the Ninth Circuit cases. The Fourth Circuit, I thought, concurred entirely and has a large block quote out of the Ninth Circuit, the Southwest Restaurant case, that says, that endorses the view about bank accounts. And here's what Judge Wilkinson said. This is one sentence of analysis. Since Winstead, who was the landowner, paid the day laborers directly from his checking account and the sharecroppers had no authority over this account, he would appear to fit squarely within the 3401D1 exception. And as he said earlier, in the opinion, that flows from, quote, the plain language of 3401D1. For as I mentioned before, Congress adopted a very simple rule because it wanted to be sure that the Treasury is gonna get that $15 share and that an employee does not take home 100% of the wages he earns. The person who has control of that... I'm sorry, Judge Wilkinson. No, no, please finish. Is the person who has the authority over the bank account when a bank account is used. Now, what Mr... Not over the amount to be paid. Correct. Not over the source of the funds. Absolutely, yeah. That is, that's exactly right. So the types of control that... What case has said that most clearly in your opinion? Southwest Restaurants' decision from the Ninth Circuit calls those, quote, irrelevant factors. The other Ninth Circuit cases say that control is not a mutually exclusive concept and that to have the control required in the statute, you need to be the only one... With control of the bank account. And if there's more than one, then you're not the statutory employer. Well, I need to be precise when I talk about more than one because in the Century Indemnity case, which is the one I believe Your Honor is talking about, the common law employer and the purported statutory employer were jointly in control of the account. The common law employer was the contractor who did the construction work and as a matter of contract, his surety was a joint signer on the account. And so the common law employer said, hey, I'm not the employer under 3401 D1 because I got the surety on my account and the surety is the statutory employer. And the Ninth Circuit said, no, that doesn't work because for 3401 D1 to operate, the common law employer has to have no control over the payment of wages. And because this account was jointly owned by the common law employer and the purported statutory employer, the common law employer had some control over the payment of wages. So the government's arguments are all, I think, deflections to look at different types of control but that are not the control of the payment of wages. One of the biggest, I think, that the government focuses on is this idea that clients had the decision at the outset of the relationship to hire Jevity, could terminate Jevity, and theoretically, although we strongly dispute this, could refuse to pay Jevity in any given week and somehow disrupt the payment of wages. But that's a different type of control. The control over the economic relationship, this decision between two corporations to enter into an economic relationship is not the same thing as controlling the payment itself. It's a little bit of sleight of hand. For as the Supreme Court said in Ott at page 55, quote, liability for the taxes accrues only when the wage is paid. And so if there were many ways that an employer, a common law employer, or a client in our parlance could disrupt the payment of wages, well, there would not be any tax withholding obligation until the wage is paid. And so at the end of the week, if Jevity is the one who writes the checks out of its own bank account, Jevity is the employer. If the client says, stop, we're not doing this anymore, and the client writes the checks out of its own bank account, well, then the client's the employer. And if- Did any of the agreements have any language as to which of the parties, Jevity or the client, would be able to seek these FICA refunds? TIP refunds? I believe that the PSA agreements themselves did not speak to this, that the parties worked it out themselves. Well over 50% of the TIP tax credits that are at issue in this case were given from Jevity to the clients. They negotiated for them. Right, but that was just a sort of side agreement, not something that was dictated by the terms of the initial agreement between the client and Jevity. I'm reluctant to say that it wasn't decided at the outset. I'm only confident saying that it is not in the four corners of those agreements, because there was a broader negotiation. But I do think this is an important point, Judge Jordan. If the parties decided at the outset which of the two was going to get the credit, with the very clear and easy to anticipate rule over the bank account rule, then there may be other aspects of the relationship that change as well. I mean, these are very complicated relationships. Mr. Christensen repeatedly called my client a payroll processor, but that is not what Jevity did. A payroll processor would be something like ADP, or a company who writes checks on someone else's bank accounts. Jevity is a PEO, a professional employer organization. It provides a wide range of human resources services, and as Judge Choflat noted, takes on the risk of paying wages when a client doesn't come forward with the money. The contracts state that Florida law, which Jevity was licensed under, required it. And more importantly, Jevity actually did it. Every week, when it issued its invoice to the client, whether or not the client paid that invoice, Jevity went ahead and paid the accrued wages. There was some discussion earlier... That's part of the bargain. Exactly, exactly. I understand it. That is exactly the service that my client sells. It ensures the... Gets paid for the risk. Exactly, yes. That is how it works, yeah. Jevity provides this as a service. It provides security for the employees. Florida has gone further and required companies in Jevity's position, not only to pay the wages, but also to pay the taxes. Florida wants to make sure that the taxman gets its share as well, and that's exactly what happened. Now there's some dispute, Mr. Christensen contends, about what can happen. Can an employer, a client, terminate these relationships? And how does that operate? Because of Florida law, any termination would be purely prospective. Jevity paid accrued wages. So if a client didn't pay one week, we paid the wages and we tried to work it out with the client. We tried to get paid afterwards. There are provisions in the agreement that provide for late fees because some clients don't pay their invoices on time, and yet Jevity still pays as it's required to. I would point the court to paragraphs, the district court's order doesn't relate any of those underlying specific facts, except to note that with some agreements, Jevity retains the ultimate liability to pay even if the client doesn't forward the funds. Was Mr. Christensen correct in telling us where you could find some of that in the record or are there other places? There are some other things I'd like to point the court to, but then I would like to address this point about the contracts as well. So I'd say, and these are all contractual provisions, so it's not really that far, but look at document 29-9, which is the Rotten Ralph contract that was submitted as an example here. Paragraph 6AV is the paragraph that says that Jevity will pay whether or not the client pays. That's the provision that does not appear in every single contract, and I'll speak to that in a moment, Judge Jordan, but provision 12A of the contract says that the client, Jevity, will still pay when there's an event of a default, because this is the paragraph on invoices, paragraph 19C and 19D. 19C says that when there's a termination of the agreement, both sides have to have all obligations that are accrued up until that point, and so if Jevity had to pay the wages, has to pay wages up until the termination, and the termination is purely prospective, and in 19D it makes very clear that the client still has to pay its invoices after a termination. The only reason the client would still have to pay the invoices is if Jevity went ahead and actually paid the wages, which is what Florida law required. Now, some of the contracts do not have the language whether or not the client pays the invoice, but when you look at those contracts against the ones that do, that's about the only difference, and so our view, I can't tell you why the contracts have a variation in the language, but our position is that because Florida law put an independent duty on Jevity to pay, whether or not it got money from the clients pursuant to the invoices, the language distinction is ultimately immaterial, and we paid. We always paid. Yes, there were about, and in fact there were about one to two million dollars a year worth of bad debts which represent clients who we invoiced and who did not come forward and pay their invoices, and yet Jevity went ahead and fulfilled its obligations not just to the employees but also to the taxman. Mr. Christensen has compared Jevity to a conduit or like a local branch manager. The reason we think that there's a material difference is that the local branch manager of a bank does not pay employee wages out of his own personal bank account, and if he did, he would be a statutory employer. Similarly, a conduit like Bank of America is just passing money that is in other people's accounts. The cash examples are different. They're more difficult, and thankfully, they're a much smaller portion of the modern economy. In the modern economy, paying out of a bank account is the vast majority of ways that wages are paid when they are actually paid, and that's the only type of control that matters. Your Honors, Jevity was a publicly traded PEO. It actually paid the wages and the taxes. It did so out of its own accounts. It did so without regard to payment from clients, and it complied with the next day deposit rules. It was assessed penalties when it filed a day or two late because it was providing something to the United States for all of these reasons. Jevity was the statutory employer. The government in this case is simply trying to have it both ways. For years, it has argued that the person who pays out of its bank account is responsible for collecting the taxes. The government has done this to go after statutory employers in every one of these other cases, and now when it's time to refund or give a credit to the company that dutifully paid out of its own bank accounts hundreds of millions of dollars for many years, the government is coming up with a new gestalt totality of the circumstances control test and rejecting the very simple rule that has served the IRS well for decades. As the Fourth Circuit said, this bank account rule flows directly from the plain language of 3401D. It is simple. It avoids fights over withholding, and it has served the government well. The judgment of the district court should be affirmed. All right. Thank you very much. Thank you. First incentive, Jevity can't or Trident standing in its shoes can't recover. Who can recover? Excuse me. Can you repeat that question? Jevity or Trident standing in its shoes can't recover the FICA tip credit. Who can? So the client employees are the ones that are entitled to the tip credit. In their role as the employer. Out of their own account. Your Honor, they supplied all of the funds to pay the taxes. The agreement required them to forward the funds for the payment of taxes to Jevity, so that Jevity could forward that to the IRS. And so they are the ones entitled to any tip credit. If FICA payments were not made in this case by Jevity on behalf of its employees, as Mr. Killian said, who would the IRS go after? The client companies who are the employers. The other one would be completely off the hook. I'll search. I'll search the federal databases and find no cases in which the IRS has gone after on an organization like Jevity. I won't find any. The government did argue in the total employment case that an organization like Jevity was still responsible, but it was not because Jevity, because that organization  If you read the government's brief, the basis for that argument was that Florida law obligated the employer. In that case, it was an actual leasing company to pay the taxes, but not because they were an employer. The Florida law, in my view, becomes part of the contract. Well, in this case, I disagree because in this case, just like an insurance code becomes part of it, the code becomes part of an insurance policy. But only if the case, the Florida law become part of the bargain. Because these arrangements did not involve the leasing of employees. That's clear. And the Florida law applies only to arrangements involving the leasing of employees. That did not happen here. So my friend's reliance on Florida law as the basis for requiring them to pay wages regardless is misplaced. And that's an issue of law. Why is it, Mr. Killian, right that what you're trying to do, essentially, is to graft on the 3401D1, which has a control definition, a common law employer definition? Because we're not relying on the factors of who determined the amount of the wages or who controlled the... In your brief, you say, look, look past the bells and whistles. The underlying client still made hiring and firing decisions. But we don't rely on that. Sure you do. It's all over your brief. You say the clients maintained control over hiring and firing. The clients were the ones who supplied the funds to the PEO. Exactly. Those are all common law employer type factors. And Mr. Killian's argument, he may be right, he may be wrong, is that you're trying to engraft a common law employer definition onto a very different definition in 3401D1. No, what we're arguing is that what does it mean to have control of the payment of wages? And we're asking the court to look beyond the simple fact that it came from someone's bank account. That may be a relevant factor, but there are other factors to consider. In the professional services cases, in the Garammy case that we've cited from the Middle District of Florida, the court looked to who was the source of the funds and who owned those funds and who supplied the payroll information each week and that those factors were relevant in deciding the meaning of control of the payment of wages. My friend asked the court to adopt a very narrow construction that the court may only look at who controlled the bank account. By the way, bank account is not mentioned anywhere in the legislative history. The branch office, the legislative history doesn't say that it did not pay out of its own bank account. I think it probably did. The fact that the legislative history doesn't even mention bank account, I think to me suggests that it's not a significant factor in determining control. All right. Thank you very much. Thank you both.